IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Main Street Business Funding, LLC,<br><br>                              Debtors | Chapter 7<br><br>Case No. 19-10598 (BLS)<br><br>**Re: D.I. 129 and 132** |

John P. Lane, Jr., Esquire  
30 Waterloo Avenue  
Unit 20  
Berwyn, PA 19312  

*Pro Se*

Ricardo Palacio, Esquire  
Ashby & Geddes, P.A.  
500 Delaware Avenue, 8th Floor  
Wilmington, DE 19801  

*Counsel to Don A. Beskrone,*  
*Chapter 7 Trustee of the Debtor*

**OPINION**[1]

Before the Court is a motion (the "Motion") filed by John P. Lane (hereinafter, the "Movant" or "Mr. Lane") seeking entry of an order directing the Trustee to pay over to him proceeds received by the Trustee in connection with a court-approved settlement of litigation.[2] The Court heard oral argument in this matter and the matter is ripe for disposition. For the reasons set forth below, the Court will deny the Motion.

**JURISDICTION AND VENUE**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O).

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedures. *See* Fed. R. Bankr. P. 7052, 9014(c).
[2] Docket No. 129.

1

**BACKGROUND**

This bankruptcy case was commenced as an involuntary proceeding by several petitioning creditors on March 20, 2019 (the "Petition Date"). The Court entered an Order for Relief on May 9, 2019.[3]

Mr. Lane is a creditor and asserts that he has a perfected security interest in certain collateral. More specifically, on February 1, 2016, Mr. Lane purchased a term promissory note (the "Promissory Note") from the Debtor in the amount of $852,500. In return, the Debtor executed a security agreement (the "Security Agreement") granting liens in favor of Mr. Lane. The Security Agreement defines the term "Collateral" in relevant part, as follows:

> [A]ll tangible and intangible personal property of Debtor, wherever located and whether now owned or hereafter acquired, including but not limited to, all accounts, contract rights, general intangibles, chattel paper, machinery, equipment, goods, inventory, fixtures, investment property, letter of credit rights, supporting obligations, books and records, deposit accounts, bank accounts, documents and instruments, together with all proceeds thereof . . . Any term used in the Pennsylvania Uniform Commercial Code (as amended from time to time, the "UCC") and not defined in this Security Agreement shall have the meaning given to the term in the UCC. In addition, the term "proceeds" shall have the meaning given to it in the UCC and shall additionally include but not be limited to, whatever is realized upon the use, sale, exchange, license, or other utilization of or any disposition of the Collateral, rights arising out of the Collateral and collections and distributions on the Collateral, whether cash or non-cash, and all proceeds of the foregoing.[4]

Mr. Lane perfected his security interest on June 21, 2018. On July 22, 2019, Mr. Lane timely filed a proof of claim in the amount of $1,287,000 ("Claim 2"). Mr. Lane alleges that $852,500 of that amount is the secured claim owed to him by the Debtor.

As part of his administration of the case, the Trustee learned of a lawsuit (hereinafter,

---

[3] Docket No. 11.
[4] *See* Security Agreement, ¶ 1(a) (Docket No. 129, Ex. B).

the "Goldner Litigation") that had been initiated by the Debtor prior to the Petition Date.[5] The Goldner Litigation concerned the efforts by the Debtor's estate to recover damages sustained by the Debtor from an alleged scheme implemented by certain defendants, and their attendant breaches of applicable standards of care owed to the Debtor.[6] The record reflects that the Goldner Litigation resulted in settlements. Specifically, on October 1, 2021, this Court approved two separate settlement agreements between the Trustee and parties to the Goldner Litigation. The Trustee is holding significant funds[7] resulting from consummation of the settlements of the Goldner Litigation. Mr. Lane asserts and the record indicates that while specific amounts of the settlements are sealed, the proceeds would be sufficient to pay his secured claim in full if allowed.

## PARTIES' POSITIONS

Mr. Lane asserts that he loaned the Debtor $852,500 and in return the Debtor granted a security interest in substantially all of its assets. Mr. Lane contends that his liens extend to the causes of action articulated in the Goldner Litigation and to any proceeds derived therefrom. As a result of the blanket lien, Mr. Lane asserts that he is entitled to all proceeds of the settlements until his secured claim is satisfied. In particular, Mr. Lane alleges that the claims in the Goldner Litigation sound in breach of contract, not in tort, and therefore are covered by his lien on all of the Debtor's contracts.

The Trustee responds that Mr. Lane's argument fails for two reasons. First, the Trustee contends that the estate claims that led to the settlement are commercial tort claims, and that Mr.

---

[5] *See* Trustee's Obj., ¶ 7 ("[I]n July 2016, the Debtor, together with co-plaintiff Robert Goggin ('Goggins'), brought and commenced an action against various party defendants, including Michael Goldner, Reger, Rizzo & Darnall LLP ('Reger Rizzo') and Joel S. Luber ('Luber'), captioned *Main Street Business Funding, LLC, et al. v. Goldner, et al.* and docketed with the Philadelphia Court of Common Pleas (the 'Trial Court') as March Term 2016, Case No. 02449 (the 'Goldner Litigation')").
[6] Docket No. 132, ¶ 8.
[7] *See* Docket Nos. 127 and 128 (By order of the Court, the settlement amounts received by the Trustee were redacted).

3

Lane's purported security interest in the Goldner Litigation is not properly described with the particularity required under Pennsylvania's Uniform Commercial Code ("UCC"). Second, the Trustee asserts Mr. Lane's security interest cannot attach to the Goldner Litigation and the settlement proceeds because the causes of actions did not exist at the time of execution of the Security Agreement. Thus, it is the Trustee's position that Mr. Lane is an unsecured creditor and does not possess any lien rights as to the settlement proceeds.

## **DISCUSSION**

There are two issues before the Court. First, whether the Goldner Litigation is a breach of contract action or a commercial tort claim. Second, if the Goldner Litigation is a commercial tort claim, whether the collateral description in Mr. Lane's security agreement is specific enough to include the proceeds of the Goldner Litigation.

A.   <u>Description of the Golder Litigation</u>

Main Street Funding was a factoring company.[8] Defendant Goldner agreed to act as a consultant to Main Street.[9] The Goldner Litigation complaint (the "Goldner Complaint") alleges that Defendant Luber (representing parties on both sides of the transaction) drafted a consulting agreement between Main Street and Defendant JDJSL LLC so that Goldner (on behalf of JDJSL LLC) could provide consulting services for Main Street (the "Consulting Agreement").[10]

The Goldner Complaint also alleges that the Defendants engaged in a fraudulent scheme to cause Main Street to borrow $700,000 through an unauthorized loan by fraudulently e-signing documents, and using those loan proceeds to purchase real property for the benefit of DOVECOTE Lane, LLC, an entity owned by the Goldner Family Trust and unrelated to the

---

[8] Goldner Complaint, ¶ 11.
[9] Goldner Complaint, ¶ 19.
[10] Goldner Complaint, ¶ 19-23.

Debtor.[11]   The Goldner Complaint asserted claims for fraudulent misrepresentation, conversion, civil conspiracy, unjust enrichment, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and legal malpractice.

B.      Whether the Goldner Litigation is a breach of contract action or a commercial tort claim?

"Commercial tort claims are tort claims arising in a commercial setting.  If the claimant is an organization, any tort claim qualifies as a commercial tort claim."[12] Mr. Lane argues, however, that the claims in the Goldner Litigation are breach of contract claims.  The threshold question before the Court is whether the Goldner Litigation is a breach of contract action (which Mr. Lane argues is subject to his lien) or a commercial tort claim.  To answer this question, the Court will analyze the "gist of the action" doctrine.

Pennsylvania courts have recognized that the gist of the action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims."[13]  "The simple existence of a contractual relationship between two parties does not preclude one party from bringing a tort claim against the other" but the doctrine "forecloses a party's pursuit of a tort action for the mere breach of contractual duties, 'without any separate or independent event giving rise to the tort.'"[14]

The doctrine bars tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms

---

[11] Goldner Complaint, ¶¶ 36-37.
[12] Lawrence's Anderson on the Uniform Commercial Code, 3d ed., § 9-102.  *See also* 13 Pa.C.S.A. §9102.
[13] *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619 (E.D. Pa. 2010) (quoting *eToll, Inc. v. Elias/Savion Adver., Inc.*, 2002 Pa. Super. 347, 811 A.2d 10, 14 (Pa. Super. 2002)).
[14] *Id.* (quoting *eToll*, 811 A.2d at 14; *see Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001)); *see Smith v. Lincoln Benefit Life Co.*, No. CIV.A.08-1324, 2009 U.S. Dist. LEXIS 24941, 2009 WL 789900, at *20 (W.D. Pa. Mar. 23, 2009).

of a contract.[15]

Simply put, "[t]he gist of the action doctrine 'precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims.'"[16]

"Whether the gist of the action applies in any particular setting is a question of law."[17] The difference between a cause of action for tort and breach of contracts is that "tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreement between particular individuals."[18]

The Court will consider each claim in the Goldner Complaint individually under the gist of the action doctrine.[19]

1. **Fraudulent Misrepresentation (Counts I and V)**

Fraudulent misrepresentation, under Pennsylvania law, consists of the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately cause by the reliance."[20]

In the Goldner Complaint, the plaintiffs alleged that the defendants "knowingly and intentionally participated in the fraudulent scheme to effectuate and/or cover up the unlawful and illicit transfer by which [defendants] secretly embezzled money from [p]laintiffs to or for their own benefit for the purpose of taking unlawful ownership of said assets to be used for their own

---

[15] *Id.* at 619-20; *see Creighton Prop. Holdings, LLC v. Lewis Bros., Inc.*, Civil Action No. 2:21-cv-279, 2021 U.S. Dist. LEXIS 191076, at *9 (W.D. Pa. Oct. 4, 2021).
[16] *3SI Sec. Sys. v. Protexk Elecs., Inc.*, No 07-4681, 2008 U.S. Dist. LEXIS 56283, at *1 (E.D. Pa. July 23, 2008) (*citing Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. Ct. 1992)).
[17] *Cola,* 745 F. Supp. 2d at 620.
[18] *Id.* at *1-2 (*citing Bash,* 601 A.2d at 829).
[19] The Court makes no ruling or determination upon the merits of the claims alleged in the Goldner Litigation.
[20] *Pansini v. Trane Co.*, No. 17-3948, 2018 U.S. Dist. LEXIS 36089, at *8 (E.D. Pa. Mar. 6, 2018) (*citing Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (Pa. 1994).

benefit."[21] "Plaintiffs relied on [defendants'] misrepresentation in agreeing to loan $150,000 to Goldner" and "disburse millions of dollars to Goldner and JDJSL."[22]

The claims here arise from alleged fraudulent acts and not out of a breach of contractual duties. The Court concludes that the fraudulent misrepresentation claims are commercial tort causes of action.

   2. **Conversion (Counts II and VI)**

Pennsylvania law defines conversion as the "deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification."[23] The Goldner Complaint alleges that several of the defendants took out an unauthorized par loan and transferred those funds for the benefit of certain defendants.[24] By causing the Debtor to repay the loan with interest, the defendants deprived the plaintiffs' right in, or use of the property.[25] The transfers were made without consent and without lawful justification.[26] The conversion claims alleged in the Goldner Complaint sound in tort, rather than breach of contract.

   3. **Civil Conspiracy (Count III)**

"Civil conspiracy requires '(1) a combination of two or more persons acting with a common purpose to do an unlawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual damages.'"[27] The plaintiffs alleged in the Goldner Complaint that several of the defendants "participated at various times in a single conspiracy centering on the embezzlement of funds by some or all of [the defendants'] for [certain defendant's] gain and have actively concealed such embezzlement through false

---

[21] Goldner Complaint, ¶¶ 87, 117.
[22] *Id.* at ¶¶ 91, 121.
[23] *Cola*, 745 F. Supp. 2d at 622.
[24] Goldner Complaint, ¶¶ 99, 127.
[25] *Id.* at ¶ 100.
[26] *Id.* at ¶¶ 101-02, 128-29.
[27] *400 Walnut Assocs., L.P. v. 4th Walnut Assocs. L.P. (In re 400Walnut Assocs., L.P.)*, 506 B.R. 645, 662 (Bankr. E.D. Pa. 2014).

misrepresentations made orally to [p]laintiffs and in writing including the backdating of documents purportedly disclosing [some of the defendants'] illicit actions."[28] The Goldner Complaint further alleged that some of the defendants "shared a common, unlawful purpose of effectuating the unlawful transfer of Main Street's assets to themselves and for their benefit without [p]laintiffs' knowledge or consent."[29]

A civil conspiracy claim cannot be pled without alleging an underlying tort.[30] The alleged civil conspiracy claim in the Goldner Complaint therefore sounds in tort.

4. **Unjust Enrichment (Counts IV and VII)**

In Pennsylvania, a plaintiff must show the following elements for a claim of unjust enrichment: "(1) the plaintiff conferred a benefit upon the defendant; (2) an appreciation of such a benefit by the defendant; and (3) the defendant accepted and retained such benefit under circumstances where it would be inequitable for the defendant to retain the benefit without payment of value."[31]

The Goldner Complaint alleges that "[b]y having $910,100 transferred to or for the benefit of [certain defendants], [p]laintiffs conferred as substantial benefit upon [certain defendants]."[32] "By causing, pursuant to the Consulting Agreement, Main Street to transfer millions in excess of the amount due under the Consulting Agreement, [p]laintiffs conferred a substantial benefit on [certain defendants]."[33]

A cause of action "based on unjust enrichment is an equitable action which sounds in

---

[28] Goldner Complaint, ¶ 105.
[29] *Id.* at ¶ 109.
[30] *Alpart v. Gen. Land Ptnrs, Inc.*, 574 F. Supp. 2d. 491, 506 (E.D. Pa. 2008) (*see Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 404 (3d Cir. 2000)).
[31] *Cola*, 745 F. Supp. 2d at 625 (*citing Global Ground Support, LLC v. Glazer Enter., Inc.*, 581 F. Supp. 2d 669, 675 (E.D. Pa. 2008)).
[32] Goldner Complaint, ¶ 112.
[33] *Id.* at ¶ 133.

quasicontract, a contract implied in law."[34]  "[I]t is a well-established rule that the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon written agreements, no matter how 'harsh the provisions of such contracts may seem in the light of subsequent happenings.'"[35]  Applying the gist of the action doctrine here, the Court concludes that the unjust enrichment claims sound in contract, rather than tort.

5. **Breach of Fiduciary Duty (Counts VIII and X)**

To establish a breach of fiduciary duty under Pennsylvania law, a plaintiff must prove that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed, that the plaintiff suffered injury, and that the agent's failure to act solely for the plaintiff's benefit was a real factor in bring about those injuries.[36]

"A breach of fiduciary duty claim is barred by the gist of the action doctrine if the duty is grounded in contractual obligations."[37]  In evaluating whether breach of duty claims are barred by the "gist of the action" doctrine, courts generally group them into two categories.[38]  First, "if the fiduciary duty at issue goes 'beyond the particular obligations contained in' the parties' contract," then it is not barred.[39]  Second, if the "[p]laintiff put forth no allegations of breach of fiduciary duty or duty of loyalty that transcend or exist outside" of their contractual obligations, then the claims are barred by the "gist of the action" doctrine.[40]

The Complaint in the Goldner Litigation alleges that Goldner, Luber and Reger Rizzo

---

[34] *Cola*, 745 F. Supp. 2d at 625.
[35] *Id.* (*quoting Wilson Area Sch. Dist. v. Skepton*, 586 Pa. 513, 895 A.2d 1250, 1254 (Pa. 2006)).
[36] *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998).
[37] *Cola*, 745 F. Supp. 2d at 620 (*citing Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008)).
[38] *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 234-35 (E.D. Pa. 2017).
[39] *Id.* at 235 (*citing Bohler-Uddeholm Am., Inc. v. Ellwood Grp. Inc.*, 247 F.3d 79, 105 (3d Cir. 2001)).
[40] *Cola*, 745 F. Supp 2d at 621; *see DePuy Synthes*, 259 F. Supp. 3d at 235.

either acted as a consultant or represented the plaintiffs.[41] In addition to running the day-to-day operations of Main Street, Goldner "operated with far superior knowledge to [p]laintiffs respecting the conduct of the factoring business; he presided over the accounts; he apportioned the money that entered the business and left the business."[42] These three defendants owed a fiduciary duty to plaintiffs, which includes obligations of loyalty, due care, fairness, good faith and full disclosure.[43] These defendants abused their trust and breach their fiduciary duty by, among others things:[44]

- "Favoring his own interests above [p]laintiffs;"

- "Looting [p]laintiff Main Street;"

- "Failing to advise [p]laintiffs of all material facts surrounding the Par Loan and looting of [p]laintiffs; [s]imultaneously representing parties whose interest were directly adverse to [p]laintiffs at virtually every stage of their dealings and failing to alert [p]laintiffs of the conflicts or withdraw;"

- "Creating false documents to conceal a fraud perpetrated on [p]laintiffs."

"Various courts have held that a breach of fiduciary duty claim will survive the 'gist of the action' doctrine because the fiduciary obligations between the [parties] are not generally defined in their agreement, but imposed by the larger social policies embodied in the law of torts."[45] The Court concludes the breach of fiduciary duty claims alleged in the Goldner Complaint sound in tort.

6. **Aiding and Abetting Breach of Fiduciary Duty (Count IX)**

The elements for aiding and abetting a breach of fiduciary duty are: "(1) a breach of fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3)

---

[41] Goldner Complaint, ¶¶ 137, 149.
[42] *Id.* at ¶ 137.
[43] *Id.* at ¶¶ 138-39, 150-51.
[44] *Id.* at ¶¶ 140, 152.
[45] *Rahemtulla v. Hassam,* 539 F. Supp. 2d 755, 779 (M.D. Pa. 2008).

substantial assistance or encouragement by the aider and abettor in effecting the breach."[46]

The Goldner Complaint alleged that the following gave rise to aiding and abetting a breach of fiduciary duty by defendant Luber:

- "Luber was an attorney facilitating Goldner's consultancy. He established the entity, under which Goldner operated."[47]

- "Luber was aware of and provided substantial assistance and encouragement to Goldner's breach of fiduciary duty insofar as he established and ran JDJSL; he established and ran DOVECOTE, the entity that knowingly received and benefited from Goldner's looting of [p]laintiff Main Street; he helped Goldner conceal the looting from [p]laintiffs; he generated backdated documents seeking to paper [sic] the looting from [p]laintiffs."[48]

Because the Court concludes that the underlying breach of fiduciary duty claim sounds in tort, the aiding and abetting claim, which is dependent upon that claim, also sounds in tort.

7. **Legal Malpractice (Count XI)**

A plaintiff asserting a claim for legal malpractice in Pennsylvania "may plead either in contract or tort."[49] In order to prevail on a claim of legal malpractice, a plaintiff must demonstrate "(1) employment of the attorney or other basis for a duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (4) that such negligence was the proximate cause of the damages to plaintiff."[50] "To sustain a claim of tortious malpractice, plaintiff must raise an issue [of] whether the defendants failed to exercise the standard of care that a reasonable attorney would exercise under the circumstances."[51]

The plaintiffs make the following allegations in the Goldner Complaint to support their legal malpractice claim:

---

[46] *DePuy Synthes*, 259 F. Supp. 3d at 241.
[47] Goldner Complaint, ¶ 143.
[48] *Id*. at ¶ 144.
[49] *Green v. Altman*, No. 03-6437, 2004 U.S. Dist. LEXIS 19145, at *11 (E.D. Pa. Sept. 21, 2004).
[50] *Juday v. Sadaka*, No. 19-1643, 2019 U.S. Dist. LEXIS 148171, at *9 (E.D. Pa. Aug. 30 2019).
[51] *Green*, 2004 U.S. Dist. LEXIS 19145, at *12.

"Luber and Reger Rizzo failed to inform [p]laintiffs of their disabling conflicts from the outset, including the pecuniary interest Luber was taking adverse to [p]laintiffs, failed to inform them of the bad acts they had uncovered, failed to inform [p]laintiffs of the bad acts in which they participated, participated in such bad acts, failed to inform [p]laintiffs of the growing, ever worsening and more layered conflicts of interest, failed to withdraw from representing other defendants or [p]laintiffs, and, in fact, pursued a course directly contrary and antithetical to the interests of [p]laintiffs, and accordingly committed legal malpractice, *a failure to exercise the ordinary skill and knowledge related to common professional practice* in representing [p]laintiffs in connection with the matters set forth herein."[52]

The legal malpractice allegation asserted by the Goldner Litigation plaintiffs sounds in tort, rather than contract.

Mr. Lane places heavy reliance on the fact that there was a consulting agreement between defendants and the Debtor, and, therefore, claims that this is a contractual dispute. However, the fact that there was a consultancy agreement is not dispositive here. The Goldner Complaint alleges a total of eleven counts, only two of which — for unjust enrichment— sound in contract. The Court considers the Complaint as a whole, and it is apparent that the Goldner Litigation ultimately boils down to a commercial tort claim. Therefore, Mr. Lane's lien upon the Debtor's contracts, and any proceeds thereof, does not reach the Goldner Litigation settlement proceeds.

C.  <u>Whether the general collateral description in Mr. Lane's security agreement includes commercial tort claims.</u>

The Pennsylvania UCC governs the manner in which this security interest was created and perfected. To be effective, a security interest must attach to the collateral at issue.[53] A security interest is enforceable against a debtor and third party with respect to collateral only if:

(1) value has been given,
(2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party, and
(3) the debtor has authenticated a security agreement which provides *a description of the collateral*.[54]

---

[52] *Id.* at ¶ 164 (emphasis added).
[53] *See* 13 Pa.C.S.A. § 9203(a).
[54] 13 Pa.C.S.A. § 9203(b) (emphasis added); *see In re B&M Hosp. LLC*, 584 B.R. 88, 94 (Bankr. E.D. Pa. 2018).

The parties are in agreement that the first two prongs are met. However, the Trustee submits that Mr. Lane's security interest fails on the third prong because the description provided in his Security Agreement and UCC-1 is very broad. The operative documents fail to mention the Goldner Litigation, the term "commercial tort claim," or any facts that might identify the state court action. To the extent he possesses a lien, Mr. Lane contends that it arises from the provisions of the Security Agreement giving him a security interest in "all tangible and intangible personal property of the Debtor."

"A commercial tort claim is defined, in relevant part, as 'a claim arising in tort with respect to which . . . the claimant is an organization.'"[55] The Pennsylvania UCC provides that a security interest in commercial tort claims cannot be obtained simply by generically describing collateral as "all property" or even as commercial torts.[56] Instead, security interests in commercial tort claims must be specifically identified or described in the security agreement.[57]

"In order for a security interest in a commercial tort claim to attach, the claim must be in existence when the security agreement is authenticated."[58] Proceeds of a commercial tort claim that are not in existence at the time of encumbrance are therefore excluded from an after-acquired general intangible clause.[59] "The UCC imposes [a] heightened description requirement 'in order to prevent debtors from inadvertently encumbering' commercial tort claims."[60]

In *Zych*, a creditor loaned money to a debtor and in return obtained a security interest in

---

[55] 13 Pa.C.S.A. § 9102.
[56] 13 Pa.C.S.A. § 9108(e)(1).
[57] *City Sanitation, LLC v. Allied Waste Servs of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 88 (1st Cir. 2011) (For example, a description such as "all tort claims arising out of the explosion of debtor's factory" would suffice.); *see Polk 33 Lending, LLC v. Schwartz*, C.A. No. 20-1647, 2021 WL 3662868 at *3 (D.Del.2021); *cf. Epicentre Strategic Corporation-Michigan v. Perrysburg Exempted Village Sch. Dist.*, No. 3:04CV7467, 2005 WL 4109509, *2 (N.D. Ohio 2005) (stating that commercial tort claim was not described in security agreement with sufficient particularity to meet burden imposed by UCC 9-108).
[58] *Bayer CropScience, LLC v. Stearns Bank Nat'l Ass'n*, 837 F.3d 911, 914 (8th Cir. 2016).
[59] *Id*. at 916.
[60] § 9108(e)(1); *see Bayer*, 837 F.3d at 916.

livestock, among other things.[61] The creditor's security agreement and financing statement adequately described the collateral as defined in the UCC.[62] Shortly after acquiring the security interest, the debtor sold the livestock to a company, who failed to tender payment due to insufficient funds.[63] The debtor and the creditor remained unpaid, and as a result the debtor filed a lawsuit.[64] The debtor and company later entered into a settlement agreement, where approximately half of the proceeds became part of the debtor's bankruptcy estate.[65] The creditor moved for relief from the automatic stay claiming that it held a perfected security interest in the settlement funds.[66]

The *Zych* court denied relief from the automatic stay and concluded that that the settlement funds were proceeds in connection with a commercial tort claim, which was not identified in the security agreement.[67] The court held that a creditor could not claim a security interest in the proceeds of the debtor's commercial tort claim because the security agreement did not identify the commercial tort claim by detailed type and because the commercial tort claim arose *after* the effective date of the security agreement.[68]

Similar to *Zych,* Mr. Lane cannot claim a security interest in the proceeds of the Goldner Litigation because these claims arose after the effective date of his Security Agreement.[69] Mr. Lane cannot prevail by relying on the after-acquired general intangible clause in the Security Agreement because the settlement payments arose as proceeds of a commercial tort claim. As a result, the Court finds that Mr. Lane's asserted interest in the proceeds never attached to the

---

[61] *In re Zych*, 379 B.R. 857 (Bankr. D. Minn. 2007).
[62] *Id.*
[63] *Id.* at 859.
[64] *Id.*
[65] *Id.*
[66] *Id.* at 857.
[67] *Id.* at 861.
[68] *Id.* at 864 (emphasis added).
[69] *Id.*

Goldner Litigation, and such interest is unenforceable against the Debtor's estate.[70].

## CONCLUSION

Studying Mr. Lane's Motion, the Trustee's Objection and the Goldner Complaint in light of the legal principles described above, the Court concludes that the Goldner Litigation is a commercial tort lawsuit. Mr. Lane failed to comply with the UCC's heightened description for commercial tort claim. Because the Pennsylvania UCC imposes heightened identification requirements to encumber a commercial tort claim, the Court further concludes that the reference in Mr. Lane's security agreement to "all tangible and intangible personal property of the Debtor, …whether now owned or hereafter acquired" did not place a lien upon any of the Debtor's commercial tort claims, including the Goldner Litigation.

For the foregoing reasons, the Court will deny Mr. Lane's Motion. An appropriate Order follows.

BY THE COURT:

Brendan Linehan Shannon
United States Bankruptcy Judge

Dated: June 8, 2022
Wilmington, Delaware

---

[70] Mr. Lane places significant weight in the Eight Circuit's decision in *Bayer*. That case is immediately distinguishable from our circumstances in that, in *Bayer*, the court permitted recovery for a secured creditor where the commercial tort at issue involved damage to equipment that was in fact Bayer's collateral.